# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS
# AT FORT RILEY, KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14-90017 |
| ) | |
| REASHEA L. THIGPEN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER

Defendant is charged with one misdemeanor count of disorderly conduct in violation of 18 U.S.C. § 13 and K.S.A. § 21-6203. This matter is before the court on defendant's motion for sanctions based on the government's failure to secure evidence during its investigation of the incident leading to the criminal charge (Doc. 9). The matter has been fully briefed and the court conducted an evidentiary hearing on May 22, 2014. Defendant appeared in person and through counsel, Bruce C. Barry. The government appeared through counsel, Erik D. Lapin, Special Assistant United States Attorney. For the reasons set forth below, the defendant's motion shall be DENIED.

### Background

On December 28, 2013, defendant accompanied her young daughter and her daughter's friend, J.S., to the Forsyth Community Center located on the base at Fort Riley,

Kansas.[1] When defendant arrived at the Center, a group of young men, including D.L.D. and J.T.J., were playing basketball. After waiting for an opportunity to use the basketball court, defendant allowed the young girls to play on the court away from the game in progress. At some point, one of the young men attempted to pass the ball to a teammate and the ball struck J.S. in the arm.

D.L.D. acknowledged the contact by stating, "My bad." The defendant informed him that "my bad" was not an appropriate or respectful apology. What occurred thereafter is disputed by the parties. The government alleges that defendant aggressively approached the young men and threatened to strike them and get her stun gun. Defendant contends that she was merely trying to explain to the young men the necessity of a respectful apology and did not act in a threatening manner; rather, that the young men acted aggressively. However, the parties agree that after defendant left the community center she returned within several minutes, accompanied by her son, Dion Smith. Defendant testified that because her son's age was similar to the young men she believed that her son might know them and could speak to them about the incident. Upon the defendant's return with Smith, another verbal altercation ensued. The details of that encounter are also disputed. Plaintiff testified that neither she nor Smith threatened the young men; however, this account is disputed by D.L.D. and J.T.J.[2]

---

[1] Unless otherwise indicated, the facts are taken from the parties' briefing (Docs. 9, 10) and testimony presented in the May 22, 2014 hearing.

[2] At the May 22, 2014 hearing, counsel for the government, with the agreement of defense counsel, provided the December 28, 2013 sworn statements of the following witnesses: Sergeant First Class Scott A. Potter, D.L.D., J.T.J, and Dion Smith.

Later that evening, Sergeant First Class Scott Potter arrived at defendant's home. While standing outside her home, he asked defendant if she was involved in an incident at the Forsyth Community Center; defendant confirmed that she had been and that she had left the center and returned with Smith. Sergeant Potter testified that he told defendant that she needed to bring her son to the military police station, and defendant then tried to slam the door in his face. Defendant denied this and contended that she merely requested to retrieve her shoes and warmer clothing but was fully compliant with Sgt. Potter's requests. Defendant claimed that Sgt. Potter used excessive force and that he placed a hand on her neck and injured her shoulder. After defendant attempted to shut the door, Sgt. Potter entered the home and secured defendant's wrists behind her back. Sgt. Potter testified that based on the door slam and his training he acted so that defendant could not move to an area where she might retrieve a weapon. Although the witnesses disagreed on the appropriateness of force used, they agreed that Sgt. Potter released defendant to retrieve her shoes and clothing and that she and her son drove in her own vehicle to the police station.

After being questioned and providing statements to the military police, the defendant and Smith were released. Defendant told Sgt. Potter that she planned to visit the hospital as a result of the alleged injury to her shoulder and that she would report him for use of excessive force. Defendant claimed that Sgt. Potter then threatened her by stating that she could go to jail for filing a false report. Sergeant Potter testified that he did not threaten defendant, but simply informed her of the consequences of filing a false report.

In his sworn statement Smith requested that the military police "check the cameras" at Forsyth Community Center. Sergeant Potter's testimony and written statement reflect that, prior to leaving the residence, Smith informed Sgt. Potter that he "wasn't going anywhere until he saw video footage of what he was accused of." Defendant testified that on or about December 29, 2013 she contacted the Forsyth Community Center to request a copy of any video surveillance taken of the basketball courts the previous evening. Defendant was told that any video could not be released to her and could only be released to government authorities. Defendant never contacted the military police or any other entity to obtain the video.

The Information charging the defendant was filed on February 27, 2014. In April 2014, after being appointed to represent defendant, counsel Bruce Barry formally requested the video from government counsel. Government counsel contacted the military police who contacted the Forsyth Community Center. The police were informed that the video no longer existed.

Nick Imel, manager of the community center,[3] testified that it has three video cameras that capture the entire gym area as well as ingress or egress from the building. He acknowledged that the video equipment does not capture audio. Mr. Imel stated that any video request must be submitted on an official request form and that he should have been aware of any requests, even if submitted verbally. He testified that the video system automatically rewrites itself every two weeks to thirty days, depending on the volume of

---

[3] Mr. Imel is employed by Corvice Military Living, an entity that operates the Forsyth Community Center.

data recorded. Mr. Imel was not aware of any request from the defendant or the military police for video regarding the December 28 incident.

Defendant seeks sanctions in the form of an order of dismissal or striking certain government witnesses based on the government's failure to secure the video prior to its destruction.

## Discussion

The questions before the court are (1) whether the failure to secure the video recording from the Forsyth Community Center on December 28, 2013 results in deprivation of either "material exculpatory evidence" or "potentially useful evidence;" and (2) whether the government's failure to secure the video amounts to bad faith, if the video is classified as only "potentially useful evidence"? The court addresses each issue below.

**Legal Standards**

When the government "fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld."[4] The United States Supreme Court defines "constitutionally material" as evidence which has two prongs: (1) it possesses an exculpatory value that was apparent to the police before the evidence was destroyed; and (2) it is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably

---

[4] *Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (citing *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Agurs*, 427 U.S. 97 (1976)).

available means.[5] The possibility that lost or destroyed evidence might have exculpated a defendant is not sufficient to meet the standard of materiality.[6]

If the evidence does not meet the standard of constitutional materiality and is therefore only "potentially useful evidence," the defendant must show that the government acted in bad faith in destroying or failing to secure the evidence in order for a due process violation to have occurred.[7] Negligence by the government is not sufficient to establish bad faith.[8]

**Analysis**

Defendant does not know whether the recording would have clearly shown what occurred at the community center. She concedes that the recording "does not rise to the level of constitutional materiality" because its exculpatory value is not apparent—therefore it fails to meet the first prong of the materiality test.[9] However, defendant also argues that no comparable evidence exists which would have captured the argument at the community center. Contrary to defendant's assertion, additional witnesses are available to testify about the interaction at the basketball court. Defendant and her son are available witnesses for the defense, and the government intends to call the two young men involved in the dispute, together with an independent witness who is expected to corroborate the men's account. More importantly, the case law is clear that *both prongs* of the "constitutional

---

[5] *California v. Trombetta*, 467 U.S. 479, 489 (1984).
[6] *United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995); *Arizona v. Youngblood*, 109 S. Ct. 333, 336 (1988).
[7] *Parker*, 72 F.3d at 1452 (citing *Youngblood*, 109 U.S. at 337).
[8] *Id.*
[9] *Trombetta*, 467 U.S. at 489.

materiality" test must be met and defendant conceded that she cannot satisfy the first prong.

Because defendant admits that the evidence is only "potentially useful" (and not "materially exculpatory"), the crux of defendant's motion is whether the government acted in bad faith in failing to secure the video recording. Defendant offers two arguments to support her claim of bad faith: (1) that the military police negligently failed to request the video, despite the request by defendant's son; and (2) that Sgt. Potter had ill will toward defendant and his animosity led to the government's failure to secure the video.

1. <u>Alleged negligence of the military police</u>.

Sergeant Potter testified that, as Watch Commander, it was not military police protocol for him to request the video. Rather, procedure dictated that he would provide his incident report and the matter would be forwarded to the investigative division to determine the need for additional investigation. At the time of his report, Sgt. Potter was unaware that the video would be erased.

The record contains no evidence of any conscious effort by the military police or the government to suppress potentially exculpatory evidence. Sergeant Potter was not required by protocol to request the video and testified that, based on his experience and witness interviews, he had enough evidence to charge the defendant without the video.[10] Defense counsel formally requested the video soon after his appointment and the government responded in a timely manner by requesting the video from Forsyth

---

[10] *Cf. Trombetta*, 467 U.S. at 488 (noting that the officers were acting "in good faith and in accord with their normal practice" and that the record contained "no allegation of official animus toward respondents or of a conscious effort to suppress evidence.").

Community Center, only to be informed that the video no longer existed. Defendant argues that the video was destroyed in an "egregiously negligent manner." Even if the military police had been negligent in failing to preserve the video evidence, negligence is not sufficient to prove bad faith.[11]

2. Excessive force/ill will.

Defendant argues that Sergeant Potter's use of excessive force and his threat of prosecution for filing a report provide evidence of bad faith. Defendant testified that she did not resist Sgt. Potter's demands. However, Sgt. Potter testified that he took defendant's violent slamming of the door as resistance, and that his training led him to do what was necessary to ensure that defendant did not retreat to an area where she could access a weapon. He admitted placing defendant's hands behind her back and did not recall placing his hand on her neck. Sergeant Potter testified that he had never met the defendant and held no hostility toward her. Defendant acknowledged that Sgt. Potter released her when inside her home and that she traveled to the police station in her own vehicle.

The court makes no finding about excessive force in the apprehension of defendant.[12] However, the court concludes that even had excessive force been used defendant offered no reasonable explanation for how that use of force would have resulted in Potter's failure to secure the video. Sergeant Potter's investigative responsibility in the

---

[11] *Parker*, 72 F.3d at 1452.
[12] According to testimony by defendant and Sgt. Potter, defendant did file a report with the Military Police against Sgt. Potter and that issue is the subject of a separate internal investigation.

investigation concluded when he submitted his initial report. No other evidence of bad faith has been presented, and defendant fails to meet her burden.

**Summary**

After careful consideration of the evidence and arguments presented by counsel, the court finds that the video would have constituted "potentially useful" evidence for the defendant. However, the defendant has not met her burden to prove bad faith on the part of the military police for failing to secure a copy of the video prior to its destruction in the ordinary course of business. Accordingly, defendant's motion for sanctions fails.

**IT IS THEREFORE ORDERED** that defendant's motion for sanctions (**Doc. 9**) is **DENIED.** Trial in this matter shall be scheduled after further consultation with counsel.

**IT IS SO ORDERED.**

Dated at Wichita, Kansas this 30th day of May, 2014.

_S/Karen M. Humphreys_____
KAREN M. HUMPHREYS
United States Magistrate Judge